**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, Plaintiffs,**

v.

**METRO–NORTH COMMUTER RAILROAD AND TRANSPORT WORKERS UNION, LOCAL 2001, Defendants.**

No. 91 Civ. 0296 (TPG).

United States District Court, S.D. New York.

Aug. 24, 1993.

Michael S. Wolly, Mulholland & Hickey, Washington, DC, for plaintiff.

C. Sue Barnett, Office of the General Counsel, New York City, for Metro–North.

James J. McEldrew, III, Smith, McEldrew & Levenberg, Philadelphia, PA, for Transp. Workers Union.

### *OPINION*

GRIESA, Chief Judge.

This action involves a labor dispute between two unions, the International Association of Machinists ("IAM") and the Transport Workers of America ("TWU"). Both unions contend that they are entitled to jobs at a Metro North facility in Brewster, New York.

In September 1991 the court directed the parties to submit their dispute to the National Railroad Adjustment Board ("NRAB"). The Second Division of the NRAB subsequently awarded the jobs to IAM. Metro North complied with the award.

TWU now petitions the court to set aside the NRAB award. The petition is granted.

### BACKGROUND

In 1987 Metro North opened a new car shop in Brewster, New York. Metro North split the work in the shop, giving TWU 60% and IAM 40%. Neither side agreed with the split.

TWU filed a grievance with the TWU–Metro North Special Board of Adjustment

("TWU SBA"). IAM did not participate in this arbitration. On December 12, 1990 the TWU SBA awarded all of the work in the shop to TWU and directed Metro North to comply within 30 days.

Meanwhile, IAM and Metro North had engaged in a separate arbitration, the IAM Public Law Board ("IAM PLB"). TWU did not participate in this arbitration. On December 20, 1990 the IAM PLB ruled that Metro North had violated the Railway Labor Act by not first negotiating with IAM before unilaterally splitting the work. The IAM PLB ordered Metro North to bargain with IAM.

In January 1991 Metro North complied with the TWU SBA and awarded all of the jobs to TWU. IAM immediately filed this action.

After a number of conferences, the court directed the parties to submit their dispute to the NRAB. The separate proceeding between TWU and Metro North and the other separate proceeding between IAM and Metro North had been essentially useless. The real dispute was between TWU and IAM, and was not between either union and Metro North. A proceeding before the NRAB would provide a mechanism to resolve the issues between TWU and IAM. The court's ruling in this regard was made at the time of the reference and will not be further discussed in this opinion.

The NRAB was established pursuant to the Railway Labor Act, 45 U.S.C. §§ 151 et seq. The Board is divided into four divisions. The Second Division, which is the relevant division in this case, has 10 members. Five of the members are selected by the railroads and five by the national unions. 45 U.S.C. § 153 First (h). One of the division's five union members is Mark Filipovic. Filipovic is an employee of IAM. TWU does not have any similar representative in the division.

An arbitration in front of the Second Division is commenced by the filing of written submissions. After all parties have filed their submissions, the arbitration is formally docketed. The matter is then assigned to a panel consisting of two or more division members. The panel can conduct hearings and make findings but has no power to issue a final award. 45 U.S.C. § 153 First (k). If the panel is deadlocked—which is the usual situation according to counsel—the division shall "select a neutral person, to be known as a 'referee', to sit with the division as a member thereof and make an award." 45 U.S.C. § 153 First (l). According to an affidavit of Filipovic, the "long-established practice" of the Second Division is for the referee to sit with the division during a hearing and then to prepare a decision of his own. Once the referee completes his decision, he mails it to the division's Executive Secretary who then circulates it to the division members. The division members then hold an "adoption session" where the members decide whether to adopt the referee's position. The referee is not present at this session. A majority vote of the division members is then necessary to make an award. 45 U.S.C. § 153 First (n).

In the arbitration at issue, Filipovic, as an employee of IAM, signed the IAM submission that was filed with the division. Once the matter was formally docketed on January 8, 1992, it was assigned to a panel consisting of two members of the division. Filipovic was one of those two panel members. The other member was a railroad representative, R.L. Hicks.

Filipovic's affidavit states that he and Hicks "immediately deadlocked the dispute so that it would be decided by a neutral referee." On February 18, 1992 the division notified all parties that the matter was deadlocked and would be submitted to a referee. A hearing with the referee was then scheduled for April 1, 1992. Edward Suntrup, a professor of labor relations, was selected to be the referee. Filipovic declares that he had nothing to do with the selection and that he did not speak to Suntrup about the case prior to the hearing.

The hearing occurred on April 1, 1992. The parties presented their respective positions to Referee Suntrup and the other division members who were present. It must be assumed that the referee received the IAM submission signed by Filipovic. Also, Filipovic was one of five attending division members. Oddly enough, the identity of these division members was not announced. TWU

was not informed that Filipovic was a Second Division member, a panel member at the time of the deadlock, or one of the division members who sat at the hearing with the referee.

Filipovic recalls that, after the hearing, Suntrup informally asked Hicks and Filipovic if either had anything to say about the case. Both said that they had nothing to add to the parties' presentations. Filipovic states that he had no subsequent personal contact with Suntrup and that he never directly or indirectly tried to influence his decision in this case. In due course, Suntrup completed his decision. He ruled in favor of IAM. Suntrup then sent the decision to the Executive Secretary, who circulated it to the division members, including Filipovic. Filipovic declares that the first time he saw Suntrup's decision was when he received it from the Executive Secretary.

On July 22, 1992 the Second Division held a session to approve Suntrup's decision. Apparently this was not a public session. The referee's ruling in favor of IAM was adopted by a unanimous vote of the six division members who were present. Filipovic did not attend.

## DISCUSSION

According to 45 U.S.C. § 153 First (q), the order of a division can only be set aside (1) for failure of the division to comply with the Railway Labor Act; (2) for failure of the division to remain within its jurisdiction; and (3) for fraud or corruption by a member of the division making the order.

Courts have also recognized a fourth ground for the judicial review of a decision by the NRAB—denial of due process. *See, e.g., Edelman v. Western Airlines, Inc.,* 892 F.2d 839, 847 (9th Cir.1989) (holding that a constitutional challenge constitutes an independent ground for judicial review of NRAB decisions).

The present case is a difficult one. TWU has not been able to demonstrate, on the present record, fraud or corruption in the usual sense. There has been no showing of bribery or other malign actions to influence the referee or the division members who made the final decision.

However, Filipovic's role involved a conflict of interest of the kind that is completely unacceptable in adjudicative bodies. IAM was one of two contesting parties. Filipovic was a member of IAM and signed the papers filed by IAM arguing its case. He was also a member of the Second Division. He actually participated in the initial step of the proceedings, which resulted in the deadlock and the reference to the referee. He sat as a member of the division during the hearing before the referee. He was a member of the division at the time the vote was taken to approve the referee's decision. Although it appears that he was absent from the session when the vote was taken regarding the referee's decision, and although he did not vote, he did not formally disqualify himself and he was still a member of the division. There is no evidence as to whether he did or did not have informal discussions with other members of the division prior to the vote.

It may be that in fact Filipovic's activity did not influence the decision that was made. IAM has argued that the initial submission resulting in the deadlock was not crucial since apparently deadlocks usually occur, and this step is mainly a formality leading to reference to the referee. It may be that Filipovic, although present to some extent at subsequent proceedings, was passive and did not really attempt to exert influence.

The problem is that these are speculative hypotheses. Without a detailed development of evidence, it cannot really be known how much Filipovic did or did not influence the outcome. There are questions about what influence he had by virtue of signing IAM's papers, and about what influence he had by his mere membership in the division. Also, there is nothing in the present record which excludes the possibility of some informal discussion by Filipovic with the other division members who voted.

TWU has requested discovery on these issues. The request is not unreasonable. However, it is totally anomalous to contemplate the gathering of detailed evidence, by way of discovery and trial, with regard to the processes of an adjudicative body.

The salient fact is that these problems should and could have been entirely avoided by the most elementary attention to proper procedure: Filipovic was required to disqualify himself from participating in any way in the activities of the division in this matter. This disqualification should have been made plain to the division members, to the referee, and to the parties to the dispute.

It is the court's finding that Filipovic's activities corrupted the process and are cause for vacating the order of the NRAB. The matter is remanded to the NRAB for a new proceeding with proper procedural safeguards.

Metro North is to continue the status quo, with IAM members in place, until and unless there is a contrary ruling by the NRAB or further order of the court.

SO ORDERED.